1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   KEITH DUANE ARLINE, JR.,                )   Case No.: 1:11-cv-00420-LJO-SAB (PC)
                                             )
12                 Plaintiff,                )
                                             )   FINDINGS AND RECOMMENDATIONS
13          v.                               )   RECOMMENDING DEFENDANTS' MOTION
                                             )   FOR SUMMARY JUDGMENT BE GRANTED
14   KEN CLARK, et al.,                      )
                                             )   [ECF No. 57]
15                 Defendants.               )
                                             )
16   _____)

17          Plaintiff Keith Duane Arline, Jr. is appearing pro se and in forma pauperis in this civil rights

18   action pursuant to 42 U.S.C. § 1983.

19          Currently before the Court is Defendants' motion for summary judgment, filed on July 25,

20   2016.

21                                          **I.**

22                          **RELEVANT PROCEDURAL HISTORY**

23          This action is proceeding against Defendants Allison, Goss and Wan for the denial of adequate

24   outdoor exercise in violation of the Eighth Amendment.

25          Defendants filed an answer to the complaint on March 5, 2015.  (ECF No. 42.)  On March 10,

26   2015, the Court issued the discovery and scheduling order.  (ECF No. 43.)

27

28

                                             1

After receiving an extension of time, Defendants filed a motion for judgment on the pleadings and request for judicial notice on January 25, 2016.  (ECF Nos. 45, 46.)  Plaintiff filed an opposition on March 28, 2016.  (ECF No. 50.)

On April 12, 2016, Defendants filed a motion for consolidate of the actions and stay of the proceedings pending the appeal in case number 1:11-cv-00293-LJO-DLB (PC), Martinez v. Allison, et.al. (E.D. Cal. Aug. 11, 2014).  (ECF No. 51.)

On May 4, 2016, the undersigned issued Findings and Recommendations recommending that Defendants' motion for judgment on the pleadings be denied.  (ECF No. 52.)  The Findings and Recommendations were adopted in full on June 13, 2016.  (ECF No. 54.)

On June 20, 2016, the Court denied Defendants' motion for consolidation, but related the instant action with 1:13-cv-02010-DAD-JLT (PC), Lopez v. Allison, and denied Defendants' motion to stay the proceedings.  (ECF No. 55.)

As previously stated, on July 25, 2016, Defendants filed a motion for summary judgment. (ECF No. 57.)  Plaintiff filed an opposition on August 15, 2016 (ECF Nos 58, 59, 60), and Defendants filed a reply on August 22, 2016 (ECF No. 61).

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

1   In judging the evidence at the summary judgment stage, the Court does not make credibility

2   determinations or weigh conflicting evidence, <u>Soremekun</u>, 509 F.3d at 984 (quotation marks and

3   citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party

4   and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de</u>

5   <u>Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation

6   marks and citation omitted).

**III.**

**DISCUSSION**

**A.     Allegations of Second Amended Complaint**

Plaintiff alleges that CSATF/SP was placed on a "Modified Program" between June 22, 2009

and December 3, 2009 during which Plaintiff was not given adequate outdoor exercise.  (ECF No. 24,

Second Am. Compl. at 4.)  Plaintiff contends that he was kept in his cell for 24 hours a day, seven

days a week.  (<u>Id.</u> at 4.)

**B.     Statement of Undisputed Facts**

1.      Plaintiff was housed at the Substance Abuse Treatment Facility and State Prison,

Corcoran ("SATF") during all times relevant to this case.  (Sec. Am. Compl. at p. 4.)

2.      Plaintiff is an African-American male.  He was born on July 22, 1978 and would have

been 30 to 31 years old at the time of the modified programming at issue in this lawsuit.  Plaintiff was

classified as a Level 4, maximum security inmate.  He was serving 50 years to life for first degree

murder.  During the relevant time period, Plaintiff was housed in Facility C and SATF.  (Declaration

of K. Allison ("Allison Decl.") ¶ 2, ECF No. 57-2.)

3.      Normal programming at a prison means inmates attend work and education programs;

have regular visiting, canteen, and telephone privileges; can attend the law library and religious

services; and are released to the yard for recreation in large groups according to their yard schedule.

During normal programming on Facility C, approximately 130 inmates at a time were permitted

access to one of the two recreation yards for outdoor exercise.  (<u>Id.</u> ¶ 3.)

4.      By contrast, a modified program typically involves the suspension of various programs

and services for a specific group of inmates or a specific part of a facility.  Modified programs are

3

necessary when correctional staff discover evidence or receive information that violence or disruptions are being planned by some inmates against other inmates or staff, or that there exists a serious threat to institutional security or the safety of inmates and staff.  Work and education programs, visiting and dayroom privileges, and outdoor yard time may be suspended; telephone, canteen, and religious programming may be restricted.  Essential services, including medical services, mental health services, and hygiene, are maintained.  (Id. ¶ 4.)

5. CDCR implements lockdowns and modified programs when they are necessary to maintain safety and security in the prisons, and to protect the lives of inmates and staff.  Decisions to implement a lockdown or modified program are usually based on numerous situation-specific facts.  Only by evaluating incidents on a case-by-case basis can prison officials determine when a prison must be locked down or a group of inmates placed on a modified program; when normal programs, including outdoor exercise, should be suspended for particular inmates; or when and how normal programming can be safely resumed.  Setting the parameters of the group of inmates subject to modified programming is always situation-specific.  The intention is to be neither underinclusive nor overinclusive, but to set the limit necessary to facilitate investigational tasks, and implement measures best designed to ensure the safety and security of the prison's staff, its inmates who were not involved.  (Id. ¶ 5.)

6. CDCR's policy is to return to normal programming as soon as it is safe to do so.  Gathering information about the cause(s) of violence, any significant security breaches that have occurred, or the plans for committing acts of violence, is imperative so that prison staff can determine how and when to resume normal programming and avoid further incidents.  Once the inmates who instigated the incident have been identified and removed from the general population and correctional staff determine it is safe to resume normal programming, a phased unlock may begin.  An unlock plan is developed to return to full programming.  During the phased unlock, inmates are released, and privileges restored, in stages.  A determination is made regarding the inmates most likely to program successfully.  Small groups of inmates may be released so that staff can monitor their conduct in a controlled environment and evaluate whether the planned unlock can proceed safely.  (Id. ¶ 6.)

4

7.      During a modified program, the Warden communicates with staff and the affected inmate population through periodic reports, called Program Status Reports ("PSRs").  PSRs update all interested parties about the status of the modified program and they communicate the Warden's plans for returning to normal programming as soon as it is safe to do so.  (Id. ¶ 7.)

8.      The PSRs were prepared by Facility Captains to memorialize Warden Allison's orders and instructions related to programming.  Only the Warden can implement, modify or terminate a modified program.  No one at SATF had the authority to alter Warden Allison's programming orders and instructions.  Warden Allison's discretion in this regard to SATF was plenary and exclusive.  (Id. ¶ 8.)

9.      On June 21, 2009, a riot occurred simultaneously on SATF Facility C's two recreation yards, as well as in the dayrooms of housing units C4, C6, and C8.  In all, 75 inmates were involved. The incident appeared to be an organized attack by members of the Southern Hispanic disruptive group (Surenos) against members of the Northern Hispanic disruptive group (Nortenos).  Three African-Americans and two Mexican Nationals were also involved.  After the violence was contained, investigators found 29 inmate-manufactured weapons on the scene.  Eleven Northern Hispanic inmates were transported to an outside hospital due to serious bodily injuries; four of them had inmate-manufactured weapons concealed in their anal cavities when they arrived.  (Id. ¶ 9.)

10.     After the June 21, 2009, riot, Warden Clark immediately placed all C Facility inmates on a modified program.  The modified program was given Program Status Number SATF-03-09-06-0235.  All C Facility recreational activities and yard access were suspended pending further intelligence gathering.  (Id. ¶ 10.)

11.     Approximately one week after Warden Clark implemented the modified program at issue, he left SATF for a position at CDCR headquarters in Sacramento.  Warden Allison then became the Acting Warden and assumed full responsibility for prison operations immediately, including responsibility for overseeing the modified program.  (Id. ¶ 11.)

12.     SATF staff conducted a comprehensive investigation into the riot and potential ongoing security threats.  The investigation included searching the prison, interviewing inmates and reviewing inmate mail to discover whether there were racial tensions which might lead to continued

5

rioting or violence.  The investigation also included intercepting messages between the inmates which are distributed by throwing paper notes between cells.  The notes are referred to as "kites."  Throughout the investigation, SATF staff reported their findings to Warden Allison at meetings and also in memoranda.  Warden Allison constantly reviewed the investigation's findings and adjusted the modified program as appropriate.  (Id. ¶ 12.)

13.     On June 30, 2009, a Southern Hispanic inmate assaulted an African-American inmate during a medical escort.  The Southern Hispanic inmate was able to slip his hand out of the handcuff and assault the restrained African-American inmate.  (Id. ¶ 15.)

14.     On July 9, 2009, Warden Allison attended a meeting to discuss the modified program.  SATF staff had received a letter written by an African-American inmate referring to an "on sight status" with Southern Hispanics and African-Americans.  "On sight status" means that inmates are instructed by their internal management to attack another group "on sight."  (Id. ¶ 16.)

15.     On July 24, 2009, SATF staff received a confidential report from a Southern Hispanic that the Southern Hispanics were to attack African-Americans or Northern Hispanics on sight.  This inmate requested removal from C Facility due to safety concerns.  (Id. ¶ 17.)

16.     On July 25, 2009, SATF staff searched an African-American inmate's cell and found notes that "it is on" with the Southern Hispanic inmate population and Southern Hispanic inmates were targeted for assault on sight.  (Id. ¶ 18.)

17.      In September 2009, four C Facility inmates were found to be in possession of weapons.  Also, on September 2, 2009, metal stock was discovered missing from light fixtures, raising concerns that additional weapons were being manufactured by the inmates.  Additional inmate weapons were found on September 10, 13, and 14, 2009.  (Id. ¶ 19.)

18.     On October 19, 2009, Warden Allison altered the modified program and began permitting recreational programming for Hispanics, African-Americans and Whites age 45 and above.  The plan was to observe whether the Southern Hispanics and African-Americans could peacefully program together before releasing their entire populations into an exercise yard.  The older Southern Hispanic and African-Americans were allowed to program together first because the majority of violent assaults were being committed by the younger inmates.  (Id. ¶ 20.)

6

19.     On October 26, 2009, additional metal stock was discovered missing in C Facility.  A search was conducted and SATF staff found a weapon, two inmate-manufactured handcuff keys and two razor blades.  All of these items were in the possession of a Southern Hispanic, who SATF staff then believed still had instructions to attack African-Americans inmates on sight.  (Id. ¶ 21.)

20.     On November 4, 2009, nine Southern Hispanic inmates carried out an attack on two Northern Hispanic inmates in C Facility.  This incident indicated that the Southern Hispanics were still committed to attacking the groups their management had targeted.  (Id. ¶ 22.)

21.     On November 16, 2009, SATF staff received confidential information in a kite that Southern Hispanics still have a "green light" to attack African-American inmates on sight.  (Id. ¶ 23.)

22.     Southern Hispanics attacked other Southern Hispanics in their cell on November 2, 2009, November 13, 2009, November 26, 2009 and November 27, 2009.  This type of inter-group violence suggested that the Southern Hispanics might have been retaliating against inmates who were not complying with their orders to attack African-Americans on sight.  The actual cause of these intra-cell attacks was never determined.  (Id. ¶ 24.)

23.     On November 5, 2009, Warden Allison altered the modified program and began permitting recreational programming for Hispanics, African-Americans and Whites age 35 and above. (Id. ¶ 25.)

24.     On December 2, 2009, Warden Allison altered the modified program and began permitting recreational programming for Hispanics, African-Americans and Whites ages 25 and above.  (Id. ¶ 26.)

25.     On January 5, 2010, Warden Allison altered the modified program and began permitting recreational programming for all African-Americans.  (Id. ¶ 27.)

26.     Breaches of security and violence are unfortunate facets of prison life.  As a Warden, Warden Allison was committed to deterring breaches of security and inmate violence whenever possible, but she was not always successful.  Anticipating and preventing the volitional acts of other people is inherently difficult.  (Id. ¶ 28.)

27.     Warden Allison was always cognizant of the fact that inmates have  a right to outdoor exercise, but the safety and security of the institution, staff, and inmates, takes precedence over all

1  other considerations.  Striking the right balance between ensuring institutional security and the safety
2  to staff and inmates, and returning inmates to regular exercise and normal programming as soon as
3  safely as possible is difficult.  In 2009-2010, there were numerous factors that Warden Allison
4  considered when deciding how and when to safely resume outdoor exercise after the modified
5  program.  Warden Allison has always believed that every modified program should end as quickly as
6  is safely possible.  (Id. ¶ 29.)

7       28.     In Warden Allison's experience, among all of the programming activities that are
8  suspended during a lockdown or modified program, it is most difficult to determine when recreational
9  programming and outdoor exercise can safely be resumed.  It is Warden Allison's experience that,
10 following a phased unlock, violence is most likely to occur on an exercise yard.  Inmates have the
11 greatest access to each other on the exercise yards, which is typically where most assaults occur.  Self-
12 imposed ethnic divisions are especially pronounced on the exercise yards because the various ethnic
13 groups often claim areas of the yard as their "turf."  The number of inmates on a yard greatly
14 outnumbers the number of correctional staff assigned to monitor the area, usually by a factor of 30 to
15 1. (Id. ¶ 30.)

16      29.     Based on Warden Allison's recollections, review of the records, training and
17 experience, it is her opinion as a correctional official that there was a legitimate penological purpose
18 for denying inmates access to the small concrete yards for outdoor exercise.  (Id. ¶ 31.)

19      30.     Management of the African-American outdoor exercise need was further complicated
20 by a July 25, 2008 riot between White and African-American inmates on SATF Facility C.  The riot
21 involved 22 African-American inmates and six White inmates.  By June 2009, African-Americans had
22 been allowed to return to outdoor exercise, but the White inmates had not because they were deemed
23 the aggressors during that conflict and we had received intelligence that they were still determined to
24 attack the African-American inmates.  Therefore, during the period in question in this lawsuit, June
25 22, 2009 to December 3, 2009, it was also necessary to restrict outdoor exercise for African-
26 Americans for protection from the White inmates.  (Id. ¶ 32.)

27      31.     Based on Warden Allison's recollections, review of the records, training and
28 experience, it is her opinion that it was absolutely necessary to suspend outdoor exercise for African-

1  Americans at SATF's C Facility from the June 21, 2009 riot until January 5, 2010 due to concerns
2  over the safety and security of the institution.  (Id. ¶ 34.)

3      **C.      Defendants' Motion for Summary Judgment/Plaintiff's Opposition**

4          Defendants contend that are entitled to summary judgment because the race-based suspension
5  of outdoor exercise was a necessary response to a large scale, race-based riot at SATF in June 2009.
6  In the alternative, Defendants argue they are entitled to qualified immunity because the law was not
7  clearly established with regard to modified program duration in 2009.

8          In opposition, Plaintiff contends that there was no genuine emergency, Plaintiff was denied
9  adequate outdoor exercise for an extended period of time, and Defendants failed to consider
10  alternative means of providing Plaintiff out-of-cell exercise.

11      1.      Eighth Amendment Violation

12      **a.      Applicable Legal Standards**

13          Section 1983 provides a cause of action for the violation of Plaintiff's constitutional or other
14  federal rights by persons acting under color of state law.  Nurre v. Whitehead, 580 F.3d 1087, 1092
15  (9th Cir 2009); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006); Jones v.
16  Williams, 297 F.3d 930, 934 (9th Cir. 2002).  "Section 1983 is not itself a source of substantive rights,
17  but merely provides a method for vindicating federal rights elsewhere conferred."  Crowley v. Nevada
18  ex rel. Nevada Sec'y of State, 678 F.3d 730, 734 (9th Cir. 2012) (citing Graham v. Connor, 490 U.S.
19  386, 393-94 (1989)) (internal quotation marks omitted).  To state a claim, Plaintiff must allege facts
20  demonstrating the existence of a link, or causal connection, between each defendant's actions or
21  omissions and a violation of his federal rights.  Lemire v. California Dep't of Corr. and Rehab., 726
22  F.3d 1062, 1074-75 (9th Cir. 2013); Starr v. Baca, 652 F.3d 1202, 1205-08 (9th Cir. 2011).

23          The Eighth Amendment protects prisoners from inhumane methods of punishment and from
24  inhumane conditions of confinement.  Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006).
25  Extreme deprivations are required to make out a conditions of confinement claim, and only those
26  deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form
27  the basis of an Eighth Amendment violation.  Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citations
28  and quotations omitted).  In order to state a claim for violation of the Eighth Amendment, the plaintiff

must allege facts sufficient to support a claim that prison officials knew of and disregarded a substantial risk of serious harm to the plaintiff.  Farmer v. Brennan, 511 U.S. 825, 847 (1994); Thomas v. Ponder, 611 F.3d 1144, 1151-52 (9th Cir. 2010); Richardson v. Runnels, 594 F.3d 666, 672 (9th Cir. 2010).

Inmates have a constitutional right to outdoor exercise under the Eighth Amendment.  Thomas, 611 F.3d at 1151-52.  Outdoor exercise is a basic human need protected by the Eighth Amendment, and the denial of outdoor exercise may violate the Constitution, depending on the circumstances. Richardson v. Runnels, 594 F.3d 666 (9th Cir. 2010); Norwood v. Vance, 591 F.3d 1062, 1070 (9th Cir. 2010).  While the "temporary denial of outdoor exercise with no medical effects is not a substantial deprivation," Norwood, 591 F.3d at 1070 (internal quotation and citation omitted), when an inmate alleges the denial of constitutionally adequate outdoor exercise, the inquiry is fact specific.  In determining whether a deprivation of outdoor exercise is sufficiently serious, the Court must consider the circumstances, nature, and duration of the deprivation.  Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979).

**b.    Findings**

As previously stated, Plaintiff contends it was cruel and unusual punishment to deprive him of out-of-cell exercise from June 22, 2009 and December 3, 2009-a total of 164 days.  There is no dispute that Plaintiff has sufficiently pled and meet the objective requirement for an Eighth Amendment claim. Thus, the only element at issue is the subjective component under the Eighth Amendment.

Although Plaintiff declares that there was no "genuine emergency", the undisputed facts demonstrate that there was a massive riot on June 21, 2009, which was coordinated by a disruptive group to occur simultaneously in multiple locations in SATF's C Facility.  The injuries were extensive, including eleven inmates being transported to the hospital due to serious bodily injury. Moreover, the riot was not limited to fist fights, as twenty-nine inmate-manufactured weapons were discovered afterward and four were found concealed in anal cavities at the outside hospital.  In support of his argument that no "genuine emergency" existed, Plaintiff submits a program status report, dated June 22, 2009, signed by Defendant K. Allison in which it was noted in the remarks section:

> On Sunday, June 21, 2009, a Riot occurred on the lower and upper yards of Facility C as well as in the dayroom of Housing Unit 4, Housing Unit 6 and Housing Unit 8 between the Northern Hispanic and Southern Hispanic inmate population as well as three Black inmates in Housing Unit 6 A pod.  A meeting was convened on Monday, June 22, 2009, and the following decision was made: the entire inmate population will be placed on Modified Program.  PSR #SATF-0003-09-06-0235 will supersede PSR #SATF-0003-08-07-0293.  The inmate population will remain on Modified Program pending further intelligence gathering.  There will be no deviation of this PSR without the approval of the Facility Captain.

(Opp'n, Ex. A, ECF No. 59.)  This exhibit does not have any probative value as to whether the June 21, 2009, riot constituted a "genuine emergency" and the exhibit itself demonstrates that all inmates were on lockdown immediately following the riot.  (Id.)

There is also no triable issue of fact as to whether the modified program was unduly prolonged, as the ongoing dangers were well-documented and undisputed.  Immediately following the riot, SATF officials launched a comprehensive investigation into the riot to determine if potential ongoing security threats were present.  (Allison Decl. ¶ 12.)  The investigation included searching the prison, interviewing inmates and reviewing inmate mail to discover whether there were racial tensions which might lead to continued rioting or violence.  (Id.)  Messages were intercepted between inmates which are distributed by throwing paper notes between cells, known as "kites."  (Id.)  During the investigation, SATF staff reported their findings to Warden Allison at meetings and through memoranda, and Allison constantly reviewed the investigation's findings and adjusted the modified program as appropriate.  (Id.)

Allison was informed that on June 23, 2009, SATF Investigative Services Unit ("ISU") interviewed African-American inmates.  (Id. ¶ 13.)  The African-American inmates reported that Southern Hispanic (Hispanic inmates from Southern California) inmates had entered their area on the recreational yard during the June 21, 2009 attack on Northern Hispanics (Hispanic inmates from Northern California).  (Id.)  The African-American inmates stated it was a disrespectful act and thus created tension between the African-Americans and Southern Hispanics.  (Id.)  Allison declares such information was vital because in prison the inmates self-segregate by race and often claim discrete territories on the recreational yards.  (Id.)   If a group transgresses on these territories, it can lead to retaliation and continued violence.  (Id.)

Allison was informed that on June 29, 2009, ISU reviewed outgoing mail which confirmed that African-Americans felt disrespected by the Southern Hispanics and "it's going to be all bad." (Id. ¶ 14.)  Another outgoing letter revealed that there was a state-wide war between Southern Hispanics and Northern Hispanics.  (Id.)  Allison was also informed that on June 30, 2009, a Southern Hispanic inmate assaulted an African-American inmate during a medical escort.  (Id. ¶ 15.)  On July 9, 2009, SATF staff received a letter from a African-American inmate indicating they were instructed to attack Southern Hispanic on sight.  (Id. ¶ 16.)  On July 24, 2009, SATF officials receive confidential information from a Southern Hispanic inmate that they were to attack African-Americans on sight. (Id. ¶ 17.)  On July 25, 2009, SATF officials intercepted a note from an African-American inmate that "it is on" with the Southern Hispanic inmate population.  (Id. ¶ 18.)  In September 2009, Allison was informed that four C Facility inmates were found to be in possession of weapons.  (Id. ¶ 19.)  In addition, on September 2, 2009, metal stock was discovered missing from light fixtures, which caused concern that additional weapons were potentially being manufactured by the inmates.  (Id.)  On October 26, 2009, additional metal stock was discovered missing in C Facility.  (Id. ¶ 21.)  After a search, SATF staff found a weapon, two inmate-manufactured handcuff keys and two razor blades in the possession of a Southern Hispanic inmate.  (Id.)  On November 4, 2009, nine Southern Hispanic inmates attacked two Northern Hispanic inmates in C Facility.  (Id. ¶ 22.)  On November 16, 2009, SATF staff received confidential information in a kite that Southern Hispanics still had a "green light" to attack African-American inmates on sight.  (Id. ¶ 23.)  On November 2, 2009, November 13, 2009, November 26, 2009, and November 27, 2009, Southern Hispanics attacked other Southern Hispanics in their cells.  (Id. ¶ 24.)  Allison declares based on her training and experience, this type of inter-group violence suggested that the Southern Hispanics might have been retaliating against inmates who were not comply with their orders to attack African-Americans on sight; however, the actual cause of the attacks was never determined.  (Id.)

Notwithstanding the ongoing investigation and subsequent incidents regarding Southern Hispanic and African-American inmates, Warden Allison began a "phase-unlock" to begin restoring a normal program and outdoor exercise.  (Id. ¶¶ 6, 30.)  On October 19, 2009, Allison began permitting recreational programming for Hispanics, African-Americans and Whites age 45 and above.  (Id. ¶ 20.)

1    The plan was to observe whether the Southern Hispanics and African-Americans could peacefully

2    program together before releasing their entire populations into an exercise yard.  (Id.)  The older

3    inmates were allowed to program together first because the majority of the violent assaults involved

4    the younger inmates.  (Id.)  On November 5, 2009, Allison altered the modified program and began

5    permitting recreational programming for Hispanics, African-Americans and Whites ages 35 and

6    above.  (Id. ¶ 25.)  Then, on December 2, 2009, Allison altered the modified program to permit

7    recreational programming for Hispanics, African-Americans and Whites age 25 and above.  (Id. ¶ 26.)

8    Thereafter, on January 5, 2010, Allison altered the modified program to permit recreational

9    programming for all African-Americans.  (Id. ¶ 27.)

10        Plaintiff contends that alternative methods for outdoor exercise were available and not utilized

11   by prison staff, namely, the use of the smaller concrete yards.  (Opp'n at 2, ECF No. 59.)  Plaintiff

12   declares that he used similar yards at a different prison.  However, Plaintiff cannot and has not

13   declared that the use of these smaller concrete yards was feasible at SATF,[1] and Defendants have

14   submitted expert opinion evidence that it was not.

15        Even viewing the facts in the light most favorable to Plaintiff, the deprivation of outdoor

16   exercise for a total of 164 days because of security concerns at SATF does not demonstrate, in this

17   case, that Defendants were deliberately indifferent to Plaintiff's health or safety needs.  Hayward v.

18   Procunier, 629 F.2d 599, 603 (9th Cir. 1980).  Plaintiff has failed to present admissible relevant

19   evidence to rebut Defendants' evidence that it was not safe to return Plaintiff to normal programming

20   following the June 21, 2009, riot until December 3, 2009, and Defendants are entitled to summary

21   judgment.

22        2.    Qualified Immunity

23        Defendants argue in the alternative that they are entitled to qualified immunity because the law

24   was not clearly established in this context.

25

26

27

28   ---
[1] Plaintiff has no training in prison management, CDCR security procedures, nor access to intelligence mined by the SATF
investigators, and therefore cannot provide expert opinion on this issue.  See Fed. R. Evid. 702, 703.

Plaintiff argues that Defendants were on notice of clearly established law that Defendants post-riot security measures were unconstitutional.  In support of his argument, Plaintiff cites Thomas v. Ponder, 611 F.3d 1144 (9th Cir. 2010)

### a.      Applicable Legal Standard

Qualified immunity is "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009) (citation and internal quotations omitted).  Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986).

In resolving the claim of qualified immunity, the Court must determine whether, taken in the light most favorable to Plaintiff, Defendants' conduct violated a constitutional right, and if so, whether the right was clearly established.  Saucier v. Katz, 533 U.S. 194, 201 (2001); Mueller, 576 F.3d at 993.  While often beneficial to address in that order, the Court has discretion to address the two-step inquiry in the order it deems most suitable under the circumstances.  Pearson, 555 U.S. at 236 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Mueller, 576 F.3d at 993-94.

The dispositive inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202.  "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. at 341.

### b.      Findings

Even if Plaintiff had met his burden of demonstrating a triable issue of material fact, Defendants are nonetheless entitled to qualified immunity.

14

In <u>Noble v. Adams</u>, 646 F.3d 1138 (9th Cir. 2011), the Ninth Circuit declared:

[i]t was not clearly established in 2002 – nor is it established yet [in 2011] – precisely how, according to the Constitution, or when a prison facility housing problem inmates must return to normal operations, including outside exercise during and after a state of emergency called in response to a major riot, here one in which inmates attempted to murder staff.

<u>Id.</u> at 1143.  The Ninth Circuit's decision in <u>Noble</u> pre-dates the modification program at issue in this case.  Thus, the appellate court's holding that the law was not clearly established demonstrates conclusively that a reasonable official would not have known that his or her conduct was unlawful. <u>Dunn v. Castro</u>, 621 F.3d 1196, 1199 (9th Cir. 2010).   In <u>Noble</u>, the Ninth Circuit reiterated that prison officials are entitled to "wide-ranging deference" and that courts must defer to prison officials' judgment so long as it does not demonstrate deliberate indifference or an intent to inflict harm.  <u>Noble</u>, 646 F.3d at 1143.   The Court recognized that prison officials were justified in declaring an emergency and imposing a lockdown, which precluded traditional outdoor exercise, until prison officials were able to gradually restore it.  <u>Id.</u> at 1144.  The Court acknowledged that prison officials were constantly reviewing the lockdown to determine how and when it was safe to lift it.  <u>Id.</u> at 1147.

In addition, in <u>Norwood v. Vance</u>, after an inmate was deprived of outdoor exercise spanning a period of two years during which four separate extended lockdowns occurred during periods of three, three, four and half, and two months.  592 F.3d at 1065.  The Court found that reasonable prison officials could have believed that restricting outdoor exercise in an attempt to restore order during a series of brutal attacks was lawful, and prison officials were entitled to qualified immunity.  <u>Id.</u> at 1068-1070.  Indeed, the Court noted that "[s]uch decision are not to be judged with the benefit of hindsight ….  It matters not whether the measures taken actually worked but whether prison officials reasonably believed they would be effective in stopping the violence.  At most, prison officials here may be faulted for erring on the side of caution by maintaining lockdowns for longer than necessary. But, when it comes to matters of life and death, erring on the side of caution is a virtue.  Certainly, no officer could reasonably have anticipated that such prudence would be found to violate the Eighth Amendment."  <u>Id.</u> at 1069.

1   Plaintiff's reliance on <u>Thomas v. Ponder</u>, 611 F.3d 1144, is misplaced.  In <u>Thomas</u>, an inmate

2   was denied outdoor exercise for 13 months and 25 days-a much longer period of time than the

3   deprivation involved in this case.  Thomas refused to sign a pledge form promising to abstain from

4   violence while participating in prison programs.  The district court granted summary judgment on the

5   Eighth Amendment claim and the Ninth Circuit reversed, finding there was a material issue of fact as

6   to "whether the prison officials' actions were reasonable."  <u>Thomas</u>, 611 F.3d at 1146.  The <u>Thomas</u>

7   decision did not reach the issue of qualified immunity and is not controlling on the qualified issue in

8   this case.  Indeed, on a factual basis the <u>Thomas</u> case is distinguishable.  There, the incident giving rise

9   to the modified program involved a single inmate who stabbed two correctional officers, whereas here,

10  the incident involved a wide-scale, race riot at SATF.

11        The Court finds that even if a genuine issue of fact exists, Defendants are entitled to qualified

12  immunity.[2]  In this instance, based on the Ninth Circuit precedent as explained above, it was not

13  clearly established in 2009 how and under what circumstances prison officials were constitutionally

14  required to provide Plaintiff with outdoor exercise in light of the ongoing violence and investigation at

15  SATF.  <u>See, e.g.</u>, <u>Negrete v. Lewis</u>, 585 Fed. Appx. 364 (9th Cir. 2014) (holding district court

16  properly granted summary judgment on basis of qualified immunity during two year period of

17  modified program (2009-2011), because "it would not have been clear to a reasonable official in

18  defendant's position that the curtailment of certain privileges and services, including exercise for

19  varying periods of time, in response to repeated incidents of prison violence, was unconstitutional.")

20  (citations omitted); <u>Crane v. McDonald</u>, No. 2:11-cv-0663 KJM CKD P, 2014 WL 2716484, at *15

21  (E.D. Cal. June 16, 2014) (prison official was entitled to qualified immunity from a prisoner's denial

22  of outdoor exercise claim based on the absence of established law in 2008-2010 clarifying when a

23  security-based lockdown becomes unconstitutional.)   Accordingly, Defendants are entitled to

24  qualified immunity and summary judgment should be granted on this basis.

25

26

27  _____

[2] Because the Court finds even if Plaintiff established a genuine issue of material fact, Defendants are nonetheless entitled
to qualified immunity, the Court does not and need not reach Defendants Goss and Wan's argument that there is no

28  evidence that these defendants had authority to alter the Warden's programming order and instructions.

16

1

2                                              **IV.**

3                                **RECOMMENDATIONS**

4          Based on the foregoing, it is HEREBY RECOMMENDED that:

5          1.      Defendants' motion for summary judgment should be granted because there is no

6                  genuine issue of material fact; and

7          2.      In the alternative, Defendants are entitled to qualified immunity.

8          These Findings and Recommendations will be submitted to the United States District Judge

9   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after

10  being served with these Findings and Recommendations, the parties may file written objections with

11  the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and

12  Recommendations."  The parties are advised that failure to file objections within the specified time

13  may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir.

14  2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

15

16  IT IS SO ORDERED.

17  Dated:   **October 19, 2016**                  _____

18                                                UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28